Well, good afternoon and welcome to the Ninth Circuit. Thank you for taking time to hear this off our normal calendar schedule. We just have the one case set for today and we'll go ahead and proceed with it. United States v. Perez, case number 23-1993. And we'll hear first from Ms. Richardson-Rover. Elizabeth Richardson-Royer, on behalf of Appellant Javier Perez. I plan to reserve three minutes for rebuttal, but I will watch the clock. Before I turn to the live issues before the court, I wanted to just draw the court's attention to several points of agreement that came out in the briefing. First, the parties appear to agree that the two appropriate places to start the guidelines calculations would be 2X1.1 for the kidnapping conspiracy count and 2A1.5 for the murder conspiracy. And second, the parties agree that if 2X1.1 is the starting point, then the three-level reduction under 2X1.1B2 is appropriate. So, in light of these agreements, it appears to me that two primary disputes remain and I hope to address them both today, time permitting. First, the question is whether, under the kidnapping guideline, it's permissible to cross-reference to first-degree murder under 2A4.1B7, as the application note number four suggests, or whether the appropriate cross-reference is whatever offense was completed, which several other circuits have held, in which this case would be attempted murder. And counsel, I take it that, I mean, that's a really interesting question, but seems to me we don't have to decide that because don't all roads lead to the question about whether the four-level enhancement of life-threatening injury was applicable here? Because if that was applicable, then the issue you just raised doesn't need to be addressed. I guess if the four-level enhancement was not applicable, then I guess we would have to address that issue. Is that the right way to think about that? That's how I see it as well. And the second issue that I wanted to address today is the four-level enhancement for the permanent or life-threatening injury. I think that if the court determines that that enhancement is not applicable, then it still has to reach the other question. So hopefully we'll have time to touch on both, but I'm happy to start with the injury. Can we start with the four-level enhancement? Of course. But to me, I'd like to hear your argument on this. And maybe you can start with, when you read the language, it does say there has to be an injury. The text says there has to be an injury. What is the injury here that you think, and then why, in your opinion, would that not be life-threatening? I think that, Your Honor, you've pointed to the exact problem with applying the enhancement in this case, is that we have to look at what the injury is and whether that injury is permanent or life-threatening. And in this case, there just wasn't enough evidence about what injury the victim suffered. There was no medical testimony. Counsel, your client was accused of basically garrotting, if that's the right term, the intended victim to the point of unconsciousness and an inability to even detect a pulse, and then throwing him off of a cliff in Mexico, believing him to have died. Why is that not a life-threatening bodily injury? Just applying reason and common sense. To me, we have to make a distinction between the defendant's conduct and the injury that the victim occurs. And I don't defend conduct. If the injury would have to be connected to the choking, is there any evidence that they couldn't find a pulse? I thought the evidence was to the contrary. The only thing I see about that is, who was this person? The woman who was there testifying, she turned back, who was all bloody and stuff, gasping for air. I felt for the pulse, and I told them I felt a pulse. Is there anything to the contrary? No, Your Honor, not that I saw in the record. There's no evidence either that they didn't have a pulse or they had a weak pulse or anything like that. That's correct. I will say that because I didn't handle the original appeal, I have not read every single page of the entire trial transcript. But the parts of the record that I have reviewed, which I think are all of the relevant parts, don't reveal any evidence that he didn't have a pulse. But can we just – and I want to still take this in two steps. When we talk about bodily injury, the bodily injury is strangulation, right? Do you agree with that? I think strangulation is the act. And I think that the injury would have to be whatever injury occurred to the victim's body. He was somewhat injured by the strangulation in the sense that he lost consciousness. So the question isn't whether he was injured. It's whether it was a life-threatening injury. Is that right? That's correct. And I think he also had ligature marks on his neck. What we don't have is any evidence about whether the loss of consciousness – Four years later, he still had ligature marks on his neck. Well, when he testified at trial, he was asked if he had scarring, and he said barely. So that's not the kind of disfiguring – you know, disfigurement that – Well, but that seems to go to permanent. If we take – I mean, you may be right. We'll hear from the government, but you may be right. I mean, by the grace of God, it sounds like this guy survived. I mean, so it may not be permanent, but it's permanent or life-threatening. And so let's take first principles here. How do we define life-threatening? We have an application note that defines that as involving a substantial risk of death. Do we look to the application note, or do you think that there is a different definition that we should apply to life-threatening? I think the application note is appropriate in this case. I don't think there's a reason not to apply it. I don't see it as inconsistent with the text of the guideline. Well, if we apply that, involving a substantial risk of death, what is the question we're asking? Is the question, when somebody is strangled to the point where they lose consciousness, there is a substantial risk of death? Is that the question that we're asking? I think that would be a good question to ask, and I don't think we have any information one way or the other in this record about whether the short loss of consciousness is a substantial risk of death. But why do we need evidence of that? I mean, isn't the evidence that he lost consciousness, and then the question is, well, when you're strangled to the point of losing consciousness, is there a substantial risk of death? Can't you just figure that out? I mean, it sounds like this guy was the opposite of an eggshell plaintiff, but that doesn't matter. We don't ask, like, this was a, you know, healthy 30-, 40-year-old man who, and I forget exactly the circumstances, but, you know, so he was less likely to die from strangulation, or maybe we do. I mean, if this had been an 80-year-old lady, would the analysis be different? No, I think the problem is that we don't have any medical testimony about whether the brief loss of consciousness in a strangulation is substantially likely to cause death, and that's where there's a lack of evidence. As a general matter, brief loss of consciousness is not likely to cause death. People faint all the time and can be out for a while. We also don't know how long he was out for, right? Was that long enough to get thrown off the cliff? Right. And how long after that he revived, we don't really know. Well, it couldn't have been long because as he was falling down the cliff, he was able to grab a root and climb up and hail a ride, you know, and during the ride, away from there, he washed his face, he changed his shirt, he had his family pick him up. He drove not just back across the border, but all the way to Lancaster to a hotel. He never sought medical attention. He never needed medical attention. And so there just is an absence of evidence about whether this strangulation event was of the dangerous type that it meets the definition of life-threatening. Aren't you forgetting something? Aren't you forgetting the testimony of the woman in the car that the purpose, basically, of driving this guy across the border in Mexico was to kill him? I don't dispute that at all. Isn't that relevant when the district court considers whether or not their intention to strangle him was to kill him? Isn't that life-threatening? If you're intending to cause the death of the victim, you put a ligature around his neck and choke him to the point of unconsciousness and then throw him off a cliff? I think reason and common sense has to play here in the analysis. Well, but the case law says we don't look at what the intention was or what the defendant's actions were. We look at the injury. And there are cases in which it was clear that the defendant was trying to kill the person and shot them at point blank sometimes. Here's where I would slightly disagree with you, though. I mean, I think your proposition makes some sense in the abstract. But here where there is some question about how strong the injury, how egregious the injury was, why isn't it – I mean, this wasn't just a random thing. They were – to Judge Tallman's point, they were trying to kill him. So why doesn't that enter in the equation that if there's some debate about how much injury there was here, the district court was within its discretion to look at the more extreme portion of that because they were trying to kill him. In fact, they thought that they had killed him, I think, is what I gather from this. It's my position that the intent, which, again, I don't dispute that they were intending to kill him, is already accounted for in the attempted murder guideline itself. And so when we're seeking to enhance the sentence on top of the attempted murder guideline because of the bodily injury that occurs, we don't look at the intent or what the defendants hoped to do. We look at what the injury was. And I think given – I guess I'm not disagreeing with you, but I don't know why that isn't a factor that comes into what the injury was. I mean, let's take the intent aside. We have two people who were looking at him, thought he was dead. Like, is that not relevant to whether this was a – whether there was a substantial risk of death? I don't think that the opinions of these individuals about whether someone is likely to die have any bearing on whether – Not whether he's likely to die. Whether he's likely to be dead then. I mean, they wouldn't have left. They threw him – correct me if I'm wrong. They threw him over the cliff because they thought he was dead. Like, it wasn't like, oh, the guy's not dead. Let's kill him by throwing him over the cliff. They thought he was dead. What they thought, respectfully, is really not relevant to the issue of what his injury was. And what we know about his injury is that he, shortly after it occurred, walked out and went home. And so, you know, if there's an absence – if the court is not willing to say the evidence is insufficient here, one alternative would be to remand for further factual development. The Fifth Circuit did that a few years back in an unpublished case. It's 662 – We remanded this once before. The court did that in Morgan, right, as well? I mean, in Morgan, they said that there was an injury, but they remanded to find out whether it was life-threatening. And I think that would be appropriate here. If the court wants to give the government, you know, a third bite of the apple, this issue was raised in the first appeal. They started a case that seems to be the closest into this, you know, where there was a strangling, and they found that it was life-threatening. There was medical testimony, is that right? Correct. It wasn't all that vigorous. I mean, it just said, well, you can die from this, essentially. Well, I think that the evidence also opines that she had been unconscious for a period of time, which is evidence that we don't have in this case. So is your position that there has to be medical evidence in all of these cases? No, I don't think so. But in this case where the victim seems to be not at risk of dying, if the government wanted to use this enhancement, I think medical evidence would have been helpful. And would the standard of proof be preponderance of the evidence since it's a sentencing enhancement? Yes. Okay. Yeah, we'll give you time for rebuttal. Thank you. Thank you. We'll hear from the government. Good afternoon, Your Honors, and may it please the Court, Sean Nelson for the United States. I can also start with the question of the life-threatening injury as well. I'd like to make two points factually at the outset. In the government's supplemental excerpt of records at page 15, it talks that the female in the car, Ms. Flora Kino, felt for a pulse, found a weak pulse. One of the other conspirators said, no, you're just feeling your own pulse. He said she felt a weak pulse. She just said she felt a pulse. It might have even been the word faint. Oh, yeah, I had felt a pulse, yes. Okay. That's correct. Is there other testimony that was fake or faint or weak? I'm sorry. What I was hoping to point to was on page 16 where one of the conspirators attempted to find respiration and found no evidence of him breathing. So that's, I think, in addition to being unconscious, not being able to breathe is another indicator of the life-threatening nature of this. The district court, for example, in his finding said something to the effect of he had no heart or something like that, and there is actually no evidence of that. Is that right? I don't think there is no evidence of that. The fact that we have a somewhat unclear where the female says she feels a pulse, the other person at the scene says, well, you're probably just feeling your own pulse. But there is evidence of no respiration in addition to being unconscious. And I want to talk about the circumstances a little bit here, and I think Judge Berzon is on to something with the Morgan case. But as I read the Morgan case, Morgan was sent back to the district court because the district court wasn't sure if it could consider some of these circumstances surrounding the injury. The court didn't think it could decide itself that it was life-threatening. I believe that the district court had said, so you had the victim had been beaten, put in the car, and driven around. And then there were other, quote, unquote, we'll call them circumstances. And it was extremely cold and so on. Yeah, put in a snowy ditch, covered with debris, and left there after the beating. The district court was unsure whether it could consider those, we'll call them circumstances. And as I read your court's decision in that case, it went back to the district court so that the district court could, in fact, consider something like that. So the district court, as I understand it, could decide to determine whether these circumstances were life-threatening. Yes, whether that could be, as I read it, whether those circumstances could be part of the calculus in determining whether these. But do you think we need, is your position we need to be doing the same thing here? Or is that a fallback position? No, no. And in fact, by the district, by the Ninth Circuit remanding the case in Morgan so that the district court could consider the, quote, unquote, circumstances, which is similar, of being left in the snow and covered with debris, that it is proper for this court to consider the fact of him being thrown off a ledge in Mexico as being part of the life-threatening nature of the injured. Specific, just to, I mean, you keep sort of misstating it. What Morgan said was we remand for the district court to consider whether defendant's maltreatment of crime was life-threatening. Mm-hmm. But I believe. To consider the circumstances in general or anything else, they determined that these circumstances were sufficient if they were life-threatening. So, and here, I mean, it seems to me that the district court at least clearly erred as to what the evidence before him was as to whether it was life-threatening because he said there was evidence that he didn't have a heart or didn't have a pulse, and that's not true. And he, yes, somebody said he wasn't breathing, but that person was clearly wrong because he was breathing. We know he was breathing.  Well, that, at the very. If he weren't breathing, he would have been dead. He wasn't not breathing, and he did not have a pulse. So those facts are incorrect. Your Honor, I do believe there is evidence that he was not breathing at that point. He would have been dead, but he was breathing, and he wasn't dead. Your Honor, respectfully, I think you can stop breathing but still survive after that. And so I think we have here evidence of a lack of respiration from the other male at the scene not sensing respiration. Now, again, this opposite of the eggshell plaintiff did somehow pull through. And, Your Honor, what I was referring to here in my reading of Morgan is. . . Can I ask about that question? Because it sort of goes to the standard that we're applying here. I mean, I take it the government would agree that we're looking ultimately whether there's a preponderance of the evidence that the injury was life threat. Yes. Is that how we should frame this up? And so is it life-threatening to the victim, or is it life-threatening in general? Because those could be two different tests. And I think that gets a little bit tricky with how we apply some of these circumstances. And the injury should be of a caliber and seriousness to be life-threatening. And I think if. . . To anyone, to the common person? Because, again, hypothetical, that would be very different if it's an 80-year-old lady or whether it's a young, healthy man, presumably. But there could be a whole bunch of factors that play into that. And what are we looking at? And I think in this case, I think under the facts of this case, regardless of the age and vitality of the victim. . . Your point is strangulation that leaves marks is life-threatening. Strangulation that results in unconsciousness and an inability to perceive respiration in the victim, combined with being thrown off the ledge in Mexico, is a life-threatening injury. There is a substantial risk of death. What does combined with being thrown off the ledge have to do with it? Well, that goes similar to the guidelines commentary that talks about not giving them food, not giving them water, not giving them. . . Because I understand what that's about. It's that there can be injuries that are internal injuries from lack of water and food and cold and so on, I mean, that are physical injuries but are not violent injuries. And so somebody can be close to death from not being fed or from not having water. And that's why there was a remand in Oregon to find out whether what happened was in fact life-threatening. It wasn't because putting them in the . . . They didn't hold at all. Putting them in the trunk and treating them terribly was itself the injury, the life-threatening injury. It's that that can cause a life-threatening injury, and that's what they're trying to find out. So I don't see what throwing the person off the cliff had to do with anything when we know that he wasn't in fact injured at all by being thrown off the cliff, wearily enough. I respectfully don't think we can say he wasn't injured at all. He had been thrown off the cliff. He had walked out of it. He climbed back. He was able to climb back. I don't believe that that doesn't show an injury. And, Your Honor . . . What's the injury? What is the injury? Murder. It's attempted murder. That's an injury. No. What I want to know is what's the injury from being thrown off the cliff? What injury did he suffer? That it's a life-threatening action. But threatening isn't the standard here. But if we're looking at real conduct-based sentencing, why can't the district court properly consider all these factors under a preponderance . . . I can understand your point with regard to the strangling. I can't understand it with regard to being thrown off the cliff. Well, but . . . I guess the better question . . . I mean . . . Throwing someone off the cliff could lead . . . It could lead to life-threatening injury. What has to be shown here? And maybe this is what Judge Brezon's question is. Was there an injury shown? I mean, he climbed up, but that doesn't show that he didn't have an injury. Climbing up never went to the doctor. There's no evidence that he had any injury from being thrown off the cliff. There's evidence that . . . I mean, is that . . . Do you agree with . . . Does the government agree with that assessment, that there's not actually an injury shown from . . . There's a potential injury from being thrown off the cliff, but there's not actual injury from being thrown off the cliff? Or we just don't know? I would agree that on this record, we don't have evidence of an injury being thrown off the cliff. However, that is the sort of deprivation that I think in Morgan at page 1188 was . . . where the district court wasn't sure if it could . . . If it results in life-threatening injury. That's why there was a remand in Morgan. Well, I think that . . . Respectfully, I read Morgan somewhat differently there, that it's looking at the fact of isolating this victim in a freezing night, covered with snow and debris on 1188. And although the district court considers those acts to be the circumstances in which the beating takes place, the court considered only the beatings, but not the deprivations to be the relevant injuries. Could you switch briefly to the other question that your opponent never got to argue, and that is the application note with regard to the cross-reference. I think you're defending the validity of that application note, but I'm not sure I quite understand your argument. I am defending . . . You answered point one, but I couldn't understand it very well. Sure. Yes, Your Honor, we are defending that application note in B7B, under B7B, application note four, that directs us to look at the intended conduct. And let me start with, when you read application note B . . . I'm sorry, subsection B7B, there are two ways to do this. And it starts with another offense is committed in connection with the kidnapping, and the . . . or . . . I'm sorry, let me start over there. B7B says we do this cross-reference in kind of two situations. The first situation has two subparts. First, whether the kidnapping was the other offenses during the commission of another offense, whether the kidnapping happens during the commission of another offense, or in connection with another offense. That's kind of 1A and 1B. Then we have two, which is another offense was committed during the kidnapping. And Smith and the cases cited by the defense apply that second prong. And I would submit to the court, that second prong addresses a situation where the kidnapping was the point of the kidnapping, and then another crime occurs during the kidnapping. But the first two prongs apply where there was another criminal objective that the kidnapping happened to be a part of. I would submit that that is what we had in this case. It's, in fact, what the district court found, that the kidnapping was in connection with the plot to murder the victim. And in that situation, where the kidnapping is but a means to achieve the larger criminal objective, Application Note 4 makes perfect sense. I could create an argument in which Application Note makes perfect sense, even on the second full prong. But in this situation, unlike Smith, which was another offense was committed during the kidnapping, this kidnapping was done in connection with the plot. So could you just run through then how, if he was kidnapped during the commission or in connection with another offense, but still the only offense was attempted murder, not murder. So how do we get to the murder? Because this is part of a conspiracy to murder. He was kidnapped as part of a conspiracy. The kidnapping happened as part of a conspiracy. But the other offense is not attempted murder or first-degree murder. It's conspiracy to murder. Yeah, under 2X1.1 with 2A4.1. And what we have here is this conspiracy to kidnap, which was done to further the conspiracy to murder. So they're in connection with. I thought that was the issue that you have some footnotes saying that you agree with the plaintiff on. I don't believe we agree with the appellant on that point, Your Honor. Well, I thought that's what you were agreeing about, that the other offense can't be a conspiracy to murder. That if we were going solely under 2A4.1, but we somewhat have to when we're under 2X1.1, which directs us to look at the intended conduct, not necessarily the offense, but here we are specifically being told to look at the intended conduct, which makes perfect sense under 2X1. The intended conduct, what you're talking about, is anything that's in my understanding is that it means that when you incorporate the guideline, when you incorporate with it any enhancements for a certain conduct. Yes, and then I think what we're arguing about here is then which conduct is applicable. And in cases of a conspiracy, you look at the intended conduct. Because conspiracy is the most specific intent, specific intent crime there is. You have a specific agreement, here a specific agreement to kill this man in Mexico. And that sort of specific intent is what under 2X1.1 we should be focusing on and punishing. And there is the argument of the defense. In 2X1.1, any intended offense conduct, it's not the best phrasing in the world, but it seems to me what it means is any conduct with regard to the intended offense, which in this case is kidnapping, that can be established with reasonable certainty. So it would go back to the attempted. So then the kidnapping provision says that you look at any offense that was, you know, whether you do it your, whichever sentence you use, it has to be an actual offense that was committed, and that was attempted murder. So I don't, the intended conduct doesn't mean what was the intended, doesn't seem to me to mean the conduct intended by the conspiracy, but the conduct that is covered by the guidelines with regard to enhancements. Your Honor, so what I would point to you there is that in 2X1.1a, it says to take the base offense level from the guideline for the substantive offense, which would be the committed offense, plus any adjustments from such guideline. That is the guideline for the substantive offense. That's the guideline we're looking at. The guideline for the substantive offense. Such guideline for any intended offense conduct. So such guideline is the guideline for the substantive offense. That's what it says. The government's reading of that is the such modifies the intended offense conduct. Okay. Okay. All right. I think we have your argument now and you're over. I know we took you over, so. I appreciate the time. Thank you. Yeah, thank you. We'll give two minutes for rebuttal. Okay. Thank you very much for giving me the extra time. I guess I'll start with the issue that I didn't get a chance to address, although I think it is briefed pretty thoroughly. It makes no sense to apply 2A4.1b7 in completely different ways, depending on whether you get there directly through a kidnapping or whether you come through 2X1.1. And that's basically, I mean, your argument that you just said, that's basically what the other circuits have held. Have any of the other circuits adopted the government's argument here? I think there were just two other cases. There were only two cases. One of them is a kidnapping conspiracy, where the 2X1.1 was applied to get to 2A4.1. And in that case, the court held that you couldn't use an incompleted offense. And I just don't see how you would apply that same provision differently depending on how you get there. You're applying the guideline because 2X1.1 tells you to do it. You should apply it consistently either way. So that argument really doesn't logically make sense to me. And then I just wanted to turn actually to Judge Nelson's question about whether we look at whether the injury is life-threatening in a general sense or whether we look at whether it was life-threatening to this victim. And I think we have to look at whether it's life-threatening to this victim. And that is what courts do. So when courts are taking testimony on how long the person was hospitalized. Why is that? Why do we do that? Is that because of the application note? Or is that because that is the plain understanding of the text that life-threatening bodily injury has to mean the victim? I think it's both. I think that the text itself, if we're talking about a bodily injury, we're talking about an injury to a person. And it's really hard to divorce that from reality. It's hard to sort of abstract that into a hypothetical effect of an injury. And then I think the application notes. But, I mean, let's take the example where, I mean, I shoot you. Well, here's an example. I had a case a few years back in the outbacks of Alaska where they took somebody, they tied him up, they shot him four times point-blank, thought he was dead. Turned out, he's in Alaska, it was so cold, it brought his blood flow down so much, he survives. You would say, and he effectively walks out of there, you would say that's not a life-threatening bodily injury because he walked out of there. But I would say you shot the guy four times point-blank execution style. How could that not be life-threatening bodily injury? I think the enhancement, the way that I read it, is not intended to provide an enhancement based on the conduct that the defendants have committed, but rather to provide an enhancement for when somebody is grievously injured. It's basically like an attempt at a murder. If you do exactly what Judge Nelson said and the guy dies, you are responsible for murder. But if he doesn't die, you're not responsible for murder. You're responsible for attempt at murder because there is an element of criminal law that cares about what actually happened in this. I remember from law school, I mean, I think the notion is that you're sort of deterring people because you're from doing something that's going to cause the murder because even when it doesn't, but you also care about the results. That's what I understand this guideline to be. It's to be focused on what – because there are all kinds of other guidelines about using the gun and causing the injury and so on. But this one is only if the person is actually at risk of death. I just don't see the logic of that. If the purpose of the guidelines is to reflect punishment for the actual conduct of the actor, why can't you look at the actor's intent in trying to murder the victim as being life-threatening? I think in criminal law in general, we often enhance the punishment based on the injury or the financial loss or whatever it is that the victim actually suffers. That is what this guideline is intended to do. The Fifth Circuit case that I mentioned before where they remanded was almost exactly like what Judge Nelson's case was, where this person was shot four times in his torso at close range, was hospitalized, and it was remanded. And they still remanded it. Sorry? And they still remanded it. They remanded it. So we are enhancing this because someone suffered an injury. Conversely, if you did have an 80-year-old lady who had a heart condition and so something, an eggshell victim, then you are responsible for the eggshell defendant. Yes. I think we have to look at what the individual's injury was and whether that injury was life-threatening to that individual human being. Okay. Well, look, thank you both. And I don't mean to cut it off if either of my colleagues have more questions, but I think we've explored this well. Appreciate your preparation for argument, and the case is now submitted. Thank you. And that concludes our arguments for the day. Thank you, Your Honor. This court for this session stands adjourned.
judges: BERZON, TALLMAN, NELSON